## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES of America** *ex rel.* | § | |
| **[FILED IN CAMERA AND UNDER SEAL]** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CASE NO.: _____** |
| **v.** | § | |
| **[FILED IN CAMERA AND UNDER SEAL]** | § | **COMPLAINT FOR VIOLATION OF** |
| | § | **THE FALSE CLAIMS ACT** |
| **Defendant.** | § | **[31 U.S.C. §§ 3729,** *et seq.***]** |
| | § | |
| | § | **JURY TRIAL DEMANDED** |

Respectfully submitted,

GAUNTT, KOEN, BINNEY & KIDD, LLP


By:   /s/ Geoffrey S. Binney_____
          Geoffrey S. Binney
          Fed. Bar No 32660
          State Bar No. 24029071
          Peter Pope
          Fed. Bar No. 2145408
          State Bar No. 24062366
1400 Woodloch Forest Dr., Suite 575
The Woodlands, Texas 77380
Telephone: 281/367-6555
Facsimile: 281/367-3705
E-Mail: geoff.binney@gkbwklaw.com
Attorneys for Qui Tam Plaintiff


[FILED IN CAMERA AND UNDER SEAL]

**IN THE UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | § | |
| ex rel. CORLA JACOBSON, | § | CAUSE NO. _____ |
| *Plaintiff* | § | |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| CRANE CO., | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**
**[31 U.S.C. §§ 3729, *et seq.*]**

COMES NOW, Corla Jacobson, qui tam Relator, through her undersigned counsel and, on behalf of the United States of America pursuant to 31 U.S.C. § 3307(b)(1), brings this cause of action against Crane Co. ("Crane") and respectfully alleges as follows:

<u>**INTRODUCTION**</u>

1.     This is an action to recover damages and civil penalties from Crane Co. ("Crane") for making false statements and claims regarding the qualification of Flowseal High Performance Butterfly valves purportedly manufactured in accordance with military specification MIL-V-24624 as listed on Qualified Product List QPL-24624, and sold to the United States or prime contractors to the United States.

2.     In 2005, in the case styled *The United States of America ex rel. Walter Klepacz v. Crane Co.*, Cause No. H-05-594, Walter Klepacz, on behalf of the United States, sued Crane for violations of the False Claims Act pertaining to the manufacturing and marketing of the Flowseal MS ("Mil-Spec") valves, which were sold directly and indirectly to the United States for installation on naval vessels. In March 2007, the United States intervened in the case and pursued

Crane for violations of the False Claims Act by making false statements regarding its Mil-Spec valves being manufactured in accordance with military specification MIL-V-24624 as listed on Qualified Product List QPL-24624, and sold to the U.S. or prime contractors to the U.S. Crane settled with the U.S. in August of 2007.

3.      Relator has been the Site Quality Manager for Crane's Crane Energy/Crane Valve North America ("CVNA") division located in Montgomery County, Texas, from November 2011 to the present. During her time as Site Quality Manager, Relator witnessed and can provide testimony and documentation to numerous and significant quality control problems concerning the sale of valves to the United States Government.

4.      Relator's claims set forth herein demonstrate a complete rejection of the terms of the 2007 settlement agreement between Crane and the United States.   Crane's ongoing practices demonstrate a complete disregard for quality and a conscious indifference towards the regulations and requirements governing its manufacturing of the Mil-Spec valves. Instead of ensuring that the regulations are implemented and followed in Crane's Conroe facility, the company has fostered a culture of protectionism and deception, circumventing process and quality control procedures, failing to report discrepancies, bypassing approved testing procedures, purchasing materials that do not conform with approved specifications, and misrepresenting to Naval Sea Systems Command ("NAVSEA") the conformity of its Mil-Spec valves to applicable government regulations.

5.      On May 4, 2017, Relator's counsel telephonically contacted the United States Attorney's Office for the Southern District of Texas, Houston Division, and provided a summary of the facts that form the basis of this Complaint. Accordingly, Relator satisfied her obligations under 31 U.S.C. § 3729, *et seq.* and is, in fact, the "original source of information" enclosed herein

as required under 31 U.S.C. § 3730 (e)(4)(A). Relator has direct and independent knowledge of the information upon which the allegations are based.

## PARTIES

6.     Plaintiff is the United States of America.

7.     Corla Jacobson ("Relator") is a resident of Texas. Relator is employed by Crane Energy from November 2011 through the present in the Conroe, Texas facility as the Site Quality Manager.

8.     Crane is a Delaware corporation, with its principal place of business at 100 First Stamford Place, Stamford, Connecticut 06902-6784.

9.     Crane specializes in, among other things, manufacturing valve and valve related industrial products through over 60 business entities located worldwide, including Crane Valves North America ("CVNA"), Xomox Corporation, Centerline, Mark Controls Corporation, and MCC Holdings.

10.     Crane entity CVNA is headquartered in The Woodlands, Texas and has manufacturing facilities in at least Mexico and Conroe, Texas.

## JURISDICTION AND VENUE

11.     This action arises under the False Claims Act, 31 U.S.C. § *3729, et seq.,* and the common law. Jurisdiction over the claims asserted in this action is based upon federal subject matter under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

12.     Venue is proper in the Southern District of Texas under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c), because Crane can be found in, and is transacting business in the Southern District of Texas, and because Crane committed acts within this District that violated 31 U.S.C. § 3729.

## FACTS

**A.      The United States Department of Defense Qualified Products List Regulations**

13.      Title 10, United States Code, Sections 2451-2457 authorizes the Secretary of Defense to establish the Defense Standardization Program ("DSP").

14.      The DSP is implemented under Department of Defense ("DOD") Instruction 4120.24. DOD Instruction 4120.24 provides for a Qualified Products List ("QPL") program.

15.      The QPL program establishes a Government maintained listing of approved manufacturers for items made to Government specifications. The United States maintains thousands of product specifications.

16.      Inclusion of an item on a QPL allows the manufacturer to provide, and the purchaser to obtain, satisfactory pre-contractual evidence that a product or family of products have been tested and have met the requirements of the applicable specification.

17.      Additionally, inclusion of an item on the QPL allows a manufacturer to, *inter alia,* advertise and make available to the Government the item without the need for time consuming and expensive First Article Testing that would otherwise need to be repeated with each separate contract for sale of the item.

18.      Stringent QPL qualification requirements ensure the integrity of the program and the corresponding ability of the Government and its contractors to have a high level of confidence in the products manufactured in accordance with specification they represent.

19.      Listing an item on a QPL does not guarantee that a manufacture will be awarded Government contracts, but many Government and prime contractor solicitations specifically require QPL items.

20.      DOD 4120.24-M, "DSP Policies and Procedures," is a manual for the utilization of

QPL's throughout the Department of Defense, and lays out the specific provisions governing QPL qualification in Enclosure 14 of DOD 4120.24-M, "Qualification."

21. Enclosure 14, in pertinent part:

a. Restricts a manufacturer's QPL qualification to *only those items listed on the QPL* (type, class, grade, process, material, or other designation) *and manufactured at the manufacturing facility listed* (Enclosure 14 9.(g)(6)(d)).

b. Requires notification to the Qualifying Activity of any change in the product or manufacturing process and must provide a complete description of the change. (Enclosure 14 9.g.(6)(f)).

c. Requires that a manufacturer "Maintain adequate process and quality control procedures to ensure that the items continually comply with ***all*** specification requirements." (Enclosure 14 11.a.(1)) (emphasis added).

d. Requires that a manufacturer immediately report any discrepancies discovered during testing and periodic reexamination of the product to the Qualifying Activity as well as the Government-Industry Data Exchange Program. (Enclosure 14 11.a.(2)).

e. Requires that the manufacturer ensure that "delivered items conform to all requirements including performance, quality, reliability, and all other specified product characteristics. (Enclosure 14 11.a.(3)).

f. Requires that a manufacturer "[e]nsure that all products are manufactured and tested in a manner that was approved under the original specification. This includes the manufacturing process and plant location, test sequences, test methods, and test procedures used. *Any change or deviations shall be immediately reported to the [Qualifying Activity] to determine the extent of requalification.* (Enclosure 14 11.a.(4)) (emphasis added).

g. Requires manufacturers to obtain and maintain a commercial and government entity code ("CAGE code") in the System for Award Management for each manufacturing facility and address associated with each supplier with which it corresponds. (Enclosure 14 11.a.(5)).

h. Requires that the manufacturer complete and submit a "Certification of Qualified Products" DD Form 1718 to the Qualifying Activity every two years. (Enclosure 14 11.a.(6)). The DD Form 1718 must be signed by a responsible official of management, and the manufacturer must certify that:

- The listed product is still manufactured at the plant shown on the QPL;

- The plant is still under the same management;

- The product is manufactured under the same conditions as originally qualified, with the same process, materials, construction, design, and manufacturer's part number or designation;

- The product meets the Mil-Spec requirements and tests;

- Any changes that have been made to the product since the qualification date. Any changes that did not get approved must be justified with supporting data showing why the change will not impact the product's qualification; and

- Company names and addresses for CAGE codes are current. (Enclosure 14 11.i.(1)-(6)).

i.     Requires that a manufacturer adhere to certain restrictions regarding advertising for qualified products, including that the manufacturer "cannot advertise or imply that its products are qualified or meet a specification that requires qualification unless they are in fact qualified and either listed or approved for inclusion on the applicable electronic QPL or QML." (Enclosure 14 11.b).

j.     Authorized distributors providing QPLs must identify the manufacturer and CAGE code, among other things, of qualified product. Additionally, "the authorized distributor must certify that the product being offered to the government ***has not been added or changed in any way*** by the distributor and is the product of the manufacturer that is on the electronic QPL or QML." (Enclosure 14 9.c.(1)) (emphasis added).

**B.     Valves Manufactured in Accordance with Mil-Spec MIL-V-24624(SH) and OPL-24624.**

22.     Mil-Spec MIL-V-24624(SH), "Valves, Butterfly, Wafer and Lug Style, Shipboard Service," dated November 3, 1983, as amended February 13, 1984 (hereinafter "MIL-V-24624"), is a specification for which a QPL has been designated: QPL-24624.

23.     MIL-V-24624 incorporates, and restates various requirements of, the QPL program found in Appendix 2 of DOD 4120.24-M, for instance:

a.     "Qualification. Valves furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.3 and 6.3)." (MIL-V-24624 ¶ 3.1).

b.     "Qualification inspection. Qualification inspection shall consist of the examination

and tests specified in 4.3.1 through 4.3.8 conducted at a laboratory satisfactory to the Naval Sea Systems Command." (Id. at ¶ 4.3).

c.   "With respect to products requiring qualification, awards will be made only for products which are, at the time set for opening bids, qualified for inclusion in the Qualified Products List QPL-24624 whether or not such products have actually been so listed by that date. The attention of the contractor is called to these requirements, and manufactures are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or purchase orders for the products covered by this specification. The activity responsible for the Qualified Products List is the Naval Sea Systems Command, ["NAVSEA"]…Application for qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6." (Id. at ¶ 6.3).

## C.   Crane's Systemic Non-Conformance with DOD Regulations

### 1.   Crane Consistently Demonstrates a Complete Disregard for Process and Quality Control Procedures

24.   From the requirements of Enclosure 14 of the DODM, through the requirements in SD-6, an integral part of QPL maintenance is the implementation and maintenance of effective process and quality control procedures. Crane's behavior discussed below demonstrates its conscious disregard for effectively maintaining quality systems as required by the Department of Defense. Despite lip service to quality, Crane chooses to adopt and cultivate a culture of obfuscation, deception, and preference for convenience rather than ensure its products adhere to the QPL and Mil-Spec requirements and specifications. The following is simply a sampling of Crane's dismissal of quality as a priority.

### a.   Engineering Change Order Process Demonstrate Crane's Disregard for Quality Control

25.   Enclosure 14 11.a.(1) requires the manufacturer to "Maintain adequate process and quality control procedures to ensure that the items continually comply with all specification requirements." Crane uses a proprietary web-based system to submit what are referred to as Engineering Change Orders ("ECO") in order to comply with this requirement. Every addition,

modification, or change to an existing completed valve, vendor list, component, drawing, and other processes utilize the ECO process to track requests. In short, the ECO process tracks every aspect of Crane's product lines—with the notable exception of quality controls. Every other department (excluding maintenance) is notified when ECOs are submitted and is involved in the approval of ECOs, including (but not limited to) Purchasing, Sales, Operations, Engineering, etc. However, the Quality Department is excluded. Accordingly, Quality has no official input in the approval process and does not get notified of changes. In every instance where ECOs are discussed or cited herein, Quality was not notified of the change and was not given authority to approve or deny the proposed change prior to implementation of the proposed change. From August 2007 to date, nearly 500 ECOs have been submitted and handled pertaining to Crane's Mil-Spec valves. Despite the requirements of 11.a.(1) of Enclosure 14 and the presence of a system designed to track and approve/deny engineering changes to its products, Crane deliberately excludes the Quality department from the decision-making process.

26.     Additionally, training on the ECO process is wholly inadequate. The parties given decision-making authority are not properly trained to make correct determinations on whether ECOs should be approved or rejected. Instead, Crane frequently approves ECOs without justification or further comment. When Relator asked multiple parties why approval was given, peer pressure is a common answer. Instead of specifying, Crane employees simply provide approval for an ECO.

27.     In other change control failures, Bills of Materials ("BOM") may be altered by shop planners with no traceability. For example, if Crane runs out of inventory on a Mil-Spec component, the planner has the ability to alter the BOM and replace the unavailable component with a different, available component on the BOM for the work order. As a result, the assemblers

construct the valve per the work order without any knowledge that the BOM originally specified a different part. Without knowledge of the original item on BOM, there is no way to track changes that are made manually to the BOM and work order.

<blockquote><b>b.  Engineering Deviations Contribute to Crane's Process and Quality Control Failures</b></blockquote>

28.     Crane's Deviation system also frequently allows for failures in process and quality control procedures. Deviations are used to modify a standard process or procedure, despite the requirements in DODM 4120.24 Enclosure 14 to maintain process and quality control procedures and notify NAVSEA of any deviations from approved procedures. Crane frequently uses Deviations to circumvent approved processes and procedures, but does not inform NAVSEA of these deviations.

29.     One such example occurred in 2010 and pertains to valve testing. MIL-V-24624 paragraph 4.3.2 requires that valve seats be subjected to bi-directional pressure tests. In February 2010, Crane issued Deviation AFD-10-008 pertaining to all High Performance Butterfly Valves, a subset of which consists of Mil-spec valves. The Deviation states, "Bi-directional testing has not proven to be beneficial to the performance of the valve," and further instructs valves to be tested in a single direction. While the Deviation states that the change does not apply to "valves supplied to VAC" (a subsidiary of W&O), few understood the exception as being applicable to Mil-Spec valves, and Crane stopped bi-directional testing on its Mil-Spec valves. It was not until July 2012 when Relator recognized the requirement, that Crane was not performing bi-directional testing, and reinstated the test for Mil-Spec valves.

30.     While all Deviations are tracked, not all pertain to Mil-Spec. That said, numerous Deviations have been issued pertaining to Mil-Spec valves, none of which have been reported to NAVSEA.

### 2.   Management Changes Have Gone Unreported

31.   Despite several changes in management at the Conroe facility and leadership over the company, Crane failed to report those changes to the Qualifying Activity. When submitting the DD Form 1718 for renewing its QPL certification, Crane is required to certify that the plant where the QPL is manufactured is under the same management as the previous qualification. DODM Enclosure 14 11.i(2). The Conroe facility underwent multiple management changes to its site leadership without notifying NAVSEA. According to an email from Senior Quality Technician John Wiles[1] to Relator in 2016, the Conroe facility had at least seven different site leaders during the relevant time period. Additional site leadership changes went unreported. In February of 2013, Norm Schultz was announced as the Site Leader for the Conroe facility. He was later replaced by Nuwan Dantanarayana in January of 2016. In addition to the Site Manager changes, Crane underwent several changes in higher-level leadership that play a direct role in the management of the Conroe facility. To Relator's knowledge, none of these changes in management were reported to the NAVSEA on either the DD Form 1718 or through any other communications.

32.   Other management changes directly impacting the manufacturing of Mil-Spec valves routinely go unreported. The Value Stream Manager at the Conroe facility oversees the production and manufacture of the Mil-Spec valves at the plant. Steve Fullerton held the position until late 2016 when he was replaced with Dwight Marek by Site Manager Nuwan Dantanarayana. Others held the position during Relator's tenure with Crane, but none of those changes were reported to NAVSEA either. Because the Value Stream Manager has direct oversight and

---

[1] John Wiles was the original replacement for Walter Klepacz, the Relator of the previous lawsuit against Crane.

management control of the Mil-Spec valve manufacturing, these changes in management have a significant impact on the day-to-day operations and manufacture of Mil-Spec valves.

**3.    Advertising Violations**

33.    Crane's advertising with one of its suppliers also violates the regulations set forth in DODM 4120.24. Enclosure 14 states, "A manufacturer cannot advertise or imply that its products are qualified or meet a specification that requires qualification unless they are in fact qualified and either listed or approved for inclusion on the applicable electronic QPL or QML." DODM Enclosure 14 11.b. Crane supplies Mil-Spec butterfly valves to W&O Supply. On its website, W&O Supply lists Crane's valves as "Navy Butterfly Valves;"[2] under "Mil-Spec Type" the website identifies five different specifications: "Mil-V-22133 lug or wafer (typical buna seat)," "Mil-V-24624 Type A (wafer) Type B (lug)," "TYIII(Bronze) TY I (Stainless)," "Ventilation valves:dwg-805-1749102- round," and "Ventilation valves:dwg-805-1749103- oval." Additionally, the page links to Crane's Flowseal Marine Brochure, which states that Flowseal valves are manufactured under an ISO 9001 Quality Assurance Program that ensures that "each valve meets or exceeds your application requirements." The brochure also states, "Flowseal is an approved supplier of High Performance Butterfly Valves in accordance with Military Specialization MIL-V-24624 (SH)." The factory in Long Beach, California has been surveyed for conformance to the MIL-I-45208 Quality Inspection System." The valves are manufactured at the Conroe facility, and the unauthorized relocation of production from Long Beach to Conroe was a significant aspect of the prior lawsuit by the U.S. against Crane. Crane's own brochure represents that not only are the valves still produced at the Long Beach facility, but also that the Mil-Spec valves are produced at a facility that conforms to the "MIL-I-45208 Quality Inspection System."

---

[2] *See* http://catalog.wosupply.com/index.php/products/navy-valves/navy_butterfly_valve, current as of the date of filing.

Long Beach does not manufacture Mil-Spec valves, and has not done so for over a decade. Furthermore, the Conroe facility has never been surveyed for conformance with MIL-I-45208. In fact, MIL-I-45208 was canceled in 1996. Crane's brochure is false and misleading regarding the location of manufacturing and implies that its facilities meet a heightened military inspection system that no longer exists. The website and brochure is false and violates the restrictions on Manufacturer's Advertising found in DODM 4120.24 Enclosure 14.

34.     Additionally, Crane is aware of the brochure's presence on W&O's website but has done nothing to have it removed. In correspondence dated February 22-23, 2011, several Crane employees discussed the presence of the brochure on W&O's website and acknowledged the errors contained within the brochure. Doug Clendenin recognized the brochure's issues and stated that the brochure has "several errors in it which have created very costly and potentially damaging problems for Crane Co.'s business with the U.S. Federal Government." Additionally, he claimed that Crane removed all copies of the brochure in 2006. He followed up on January 25, 2011, once again acknowledging the prior lawsuit. He stated that the brochure should have been deleted, and if not, that Crane should confirm so that no old copies of the brochure are distributed. Despite the sense of urgency displayed in emails by Mr. Clendenin, the brochure remains prominently visible on W&O's product page for the Mil-Spec valves to this day, over seven years since the original emails were sent. Whatever concern Crane had about removing the brochures did not result in the removal of the brochure from the product page where the Mil-Spec valves are displayed for marketing and purchase. The brochure remains publicly available well over ten years after Crane "removed all copies." Not only does the brochure blatantly violate the restrictions on advertising, but also Crane was aware of its presence on W&O's website and failed to ensure that the brochure was removed from the product page.

4.      **Crane Internal Drawings Do Not Conform to NAVSEA-Approved Requirements**

35.     Crane's valves frequently do not conform to the specifications approved by NAVSEA, whether in design or in practice. As discussed below, components pertaining to a specific order measured outside approved tolerances in many areas. Additionally, internal component drawings frequently do not match the specifications approved by NAVSEA. Crane internal drawings use a different Standard Tolerance than the drawings approved by NAVSEA. In the Mil-Spec drawings approved by NAVSEA, all measurements that do not have a specified tolerance use the following tolerances:



**CRANE Drawings Approved by NAVY**

This specifies that angles cannot have any variance, while decimal measurements have different tolerances based on the precision of the measurement. Contrast that with Crane's Standard Tolerances used in its internal drawings for wedge pins:



**CRANE Component Drawings**

This specifies that angles may have a 30-second variation, while the variations in decimals range from twice to five times as large as the approved tolerance. In other instances, the tolerance varies

within individual parts, varying from drawing to drawing. The drawings nearly always allow for greater tolerance than specified by the NAVSEA-approved drawings. The net result is the same: Crane's inconsistent acceptable tolerance levels consistently exceed the standard tolerance levels approved by NAVSEA.

36.     Additionally, Relator conducted gap analyses into several components, comparing the NAVSEA-approved drawings with Crane's internal drawings. As discussed in detail below, Relator found a number of discrepancies within the wedge pin drawings. Relator also examined the dimensions specified for the discs, finding a significant number of critical to quality measurements where internal drawings exceeded approved tolerances. Each component with internal drawings likely have the same type of discrepancies, with Crane's internal specifications impacting manufacturing processes which exceed maximum tolerances approved by NAVSEA.

**5.      Crane Violated Multiple Requirements in Retagging Mil-Spec Valves**

37.     In submitting its DD Form 1718, Crane misrepresented to NAVSEA that its valves are manufactured under the same conditions as originally qualified. The form requires the manufacturer submitting for QPL renewal to certify that "The product is manufactured under the same conditions as originally qualified, with the same process, materials, construction, and manufacturer's part number or designation." DODM 4120.24 Enclosure 14 11.i.(3). None of Crane's certifications since 2010 have contained any declarations of changes to any of the items that the DOD Manual requires. Despite those representations, numerous instances of variations in one or more of the requirements occurred at Crane, without notification to NAVSEA.

**a.      Crane Retagged Non Mil-Spec Valves as Mil-Spec Valves**

38.     In October 2011, Craig Bernard with W&O created a "C.A.R.E." for returning a number of valves of Purchase Order Number 1116966 for the return of 33 Mil-Spec valves of

varying sizes. The original purchase order contained eight line-items for a total of 35 valves. None were requested in Mil-Spec configuration in the original purchase order. However, W&O returned the valves, stating, "Valves need to be returned to Conroe for retagging. Valves must be retagged as 533's." The valves were originally tagged as "833" type valves, indicating that the valve bodies were made of aluminum bronze, B148 ASTM C958 material. The body type requested by W&O, type "5," is aluminum bronze that meets MIL-B-24480 specifications. Additionally, the CARE specifies a product type of "Mil-Spec" to be returned after retagging. By the plain language of the return and request, W&O did not return the valves and request new valves that are Mil-Spec certified. Instead, W&O requested Crane remove the tags identifying the valves as noncompliant FlowSeal valves and *retag* the returned valves as Mil-Spec valves.

39.     Amazingly, Crane complied with W&O's request and generated additional line items tied to the same sales order for the retagged valves. Each of the line items specified the Product Class Code as "FSML," Crane's notation for FlowSeal valves that are certified as Mil-Spec. Crane retagged the returned valves as Mil-Spec valves and indicated that the body material is MIL-B-24480 aluminum bronze. In doing so, Crane issued a new serial number to each of the returned valves. Thus, Crane returned the valves with the "533" configuration and indicated the valve was Mil-Spec compliant, which it clearly was not. Furthermore, Crane returned the valves with a Certified Materials Test Report ("CMTR") that certified that the valves were tested to Mil-V specifications. Obviously W&O's request and Crane's response create a number of problems.

40.     First, Crane shipped valves to W&O tagged as Mil-Spec valves that were not in compliance with Crane's QPL Mil-Spec certification. Instead of replacing the noncompliant valves with Mil-Spec valves, Crane simply retagged the original non-complying valves, issued new serial numbers and re-issued CMTRs for the retagged valves that certified that the valves are

Mil-Spec valves and passed Mil-V testing procedures. Crane did this in violation of a number of regulations within DODM Enclosure 14, including a failure to report discrepancies in the production process, a failure to maintain quality control procedures, a failure to ensure that products were manufactured and tested as approved in the original specification, as well as other failures.

41.     Additionally, even the retagged valves returned as Mil-Spec valves do not meet the approved QPL configuration. The returned valves were requested to be retagged as "533s," with the full requested valve configuration being ##-1LA-533RTG-BOJ ("##" being the various sizes of valves returned). Crane's NAVSEA-approved QPL for this valve type is ##-1LA-5X3XGF-3MG. Instead of requesting a fully compliant Mil-Spec valve, W&O only requested that the body material of the valve be aluminum bronze that is compliant with the MIL-B-24480 specification. To truly qualify as Mil-Spec valves, Crane would have to change out not only the body material on these valves, but also the disc material, seat material, packing material, bearing material, and actuator. Crane did nothing to inform W&O of this error, but instead simply complied with the request and retagged the returned valves as Mil-Spec valves.

42.     As mentioned previously, Crane also issued the valves new serial numbers when it retagged the valves as Mil-Spec valves. The new serial numbers issued to the retagged valves all begin with the prefix "J37,"[3] which indicates that the valves were manufactured at the Chihuahua Crane Factory in Chihuahua, Mexico. Crane's QPL certifies it only to produce Mil-Spec valves at its Conroe facility. It cannot manufacture Mil-Spec valves in Chihuahua. While it is possible that the valves Crane retagged as Mil-Spec were not actually manufactured in Mexico, the reissuance of serial numbers with the J37 prefix destroys traceability, rendering the true source of the valves

---

[3] As will be discussed below, W&O encountered significant problems with the retagged valves and sent 30 of the 33 back to Crane for repair. All of the returned valves had serial numbers beginning with the "J37" prefix.

unverifiable. Crane's systemic failure to maintain standard practices and procedures frequently produce results such as this.

**b.     Crane Encountered Subsequent Issues with the Retagged Valves**

43.     Subsequent additional problems from these retagged Mil-Spec valves demonstrate Crane's cavalier attitude and approach to adhering to the manufacturing and testing processes that were approved when receiving QPL certification. In maintaining the QPL certification, the manufacturer must:

> Ensure that all products are manufactured and tested in a manner that was approved under the original specification. This includes the manufacturing process and plant location, test sequences, test methods, and test procedures used. Any change or deviations must be immediately reported to the qualifying activity to determine the extent of requalification.

Enclosure 14 11.a.(4). In January 2012, W&O reported that all but four of the valves Crane shipped as part of this purchase order had failed testing and were being returned for repairs. Failure during the testing W&O performed indicates that the valves do not seal properly, allowing leakage through the seat. W&O created a second CARE for this purchase order, supposedly returning 31 of the 35 valves originally purchased, but Crane received 30 valves for repair. The supplier returned a total of 30 failing valves, including 12 four-inch valves, 13 five-inch valves, 2 six-inch valves and 3 eight-inch valves, and requested repairs be made. As with the prior issue, Crane received the valves and created new line items in the original sales order for the valves. As with the prior issue, the sales order line items' Product Class Code designated the valves as "FSML" for Flowseal Mil-Spec type valves.

44.     Crane engineers were unable to determine the cause of the valves' failure. For each of the different sizes of returned valves, Crane disassembled and reassembled the valves, taking measurements for each valve's body, disc, and retainer rings. Each measurement has a "nominal"

value as well as a minimum and maximum tolerance level, which is defined on the drawings submitted to NAVSEA for formal approval. Of those dimensions, Crane designated several dimensions as "critical to quality," meaning those dimensions have a direct and significant impact on the quality of the valves. Each of the spreadsheets identified critical to quality measurements that were outside the acceptable tolerance approved by NAVSEA. Additionally, each spreadsheet contained the disclaimer, "Note: Valve were assembled/disassembled and reassembled causing some dimensions to change. EX pin holes." By stating that disassembly/reassembly may cause some measured dimensions to change, Crane implied the dimensions of its valves is heavily dependent on the assembly of each individual valve. Since the variations in dimensions are not uniform with even the two valves of each type tested, there is no way Crane could ensure its valves conform to all requirements specified in a uniform manner as required by Enclosure 14 11.a.(3). Despite the relatively large number of measurements outside acceptable tolerance, Crane made no conclusions and took no action on the measurement results.

45.     Conforming to its culture of deception, Crane conducted improvised tests designed to produce passing results for the returned valves. The test methods and procedures used were not approved in the original specification, and therefore violated Crane's obligation under Enclosure 14 11.a.(4) detailed above. As mentioned previously, the seat material used in the valves did not conform to approved specifications. Instead, the seat was made of "RTFE/Silicone" material, which is a generic reinforced Teflon variant. RTFE seats are rigid and inflexible, which was believed to be the cause of the testing failures. As a result, Crane engineers soaked the seats of several of the valves in a hot water bath at 145° for an hour before each test. The engineers hoped this would "soften" the stiff seat material enough to produce a passing result. Ultimately, and not surprisingly, the method did not produce reliable results. This incident further demonstrates

Crane's flippant attitude towards its QPL certification requirements. Crane consistently disregards normal testing methods and procedures in favor of expedience and convenience, preferring a "whatever works" approach to testing.

46.     Ultimately, Crane performed a number of tests on each of the returned valves. While several valves had components replaced and passed testing, no cause of the failures was ever determined. Crane did not investigate further in order to prevent the problems from reoccurring. Instead, it re-issued CMTRs for each of the returned valves and certified that the valves again passed MIL-V-24624 shell and seat testing requirements. No documentation on the testing found in the CMTR's exists, however; it is likely that the CMTR results were automatically generated.

47.     In addition to the above testing issues, in 2015 Relator was approached by Mike Miller, a machinist assigned to working on Mil-Spec valves, who advised Relator "he thought he saw something wrong." The machinists were unable to get a batch of valves to past testing, so someone from the plant brought a toaster oven into the plant. The engineers then used the toaster oven to heat up the seats, ostensibly to soften the seats in order to pass testing like they did with the hot water baths discussed above.   Upon information and belief, these seats were placed in valves and shipped to fulfill orders.

**6.     Crane Uses Unapproved Materials in Mil-Spec Valves**

48.     Despite certifying that the valves are manufactured in the exact manner as approved, Crane routinely uses materials not approved by NAVSEA in its specifications. By way of example, as discussed in the section above, Crane routinely uses RTFE as the material for the soft seat/o-ring in the Mil-Spec valves. There have been instances where a customer request for RTFE soft seats has been rejected. In other instances, Crane demonstrates its own confusion on

what materials NAVSEA approved for inclusion in Mil-Spec valves. In yet another example, Crane approved a customer request for replacement of the NAVSEA-approved valve for an unapproved Fire-Flow RTFE valve. Additionally, in 2012, Joel Eberlein drafted a memorandum to Pat O'Brien on the topic of RTFE soft seats being sold in Mil-Spec valves. The memorandum acknowledges the sale of Mil-Spec valves with RTFE soft seats instead of the approved material, and notes, "Further, research continued to show little to no internal Crane documentation regarding RTFE." The memorandum found multiple BOMs from the customer specifying RTFE soft seats. Despite Crane's fulfillment of these orders and its knowledge of this issue, Crane has never reported to NAVSEA its inclusion of RTFE soft seats in Mil-Spec valves.

49.     This is simply one example of Crane selling Mil-Spec valves with components made from unapproved materials. Other unapproved materials include: hand wheels must be ASTM B62, but test data shows wheels have lead and zinc above allowable levels and the tin content is below the required level of the ASTM; gland followers should be 18-8 stainless steel, but instead is ASTM A743 (also known as CF8), a material not approved by NAVSEA.

**7.     Crane Sells Valves with Modifications Not Approved by NAVSEA as Mil-Spec Valves**

50.     Since at least 2007, Crane has supplied valves with holes drilled in the discs, shipping the valves tagged and identified as Mil-Spec valves. In December 2007, Crane submitted a drawing to Bath Iron Works for 6-inch to 12-inch wafer type butterfly valves with drilled discs with the drawing number 1WA-291FGF-3XG. The Figure number identifies the valve as a Mil-Spec valve, and the Notes confirm both that the disc has been drilled ***and*** that the valve is purportedly in conformance with MIL-V-24624. Additionally, the notes state that the valve is listed on the Qualified Products List QPL-24624. Crane created a part number and approved this valve for production under ECO 851 in November 2007. Crane created the part description "08-

1WA-294FGF-3XG (DRILLED DISC)" for the valve, still asserting that this valve is a Mil-Spec valve. When the tag is generated for this type of valve, the parenthetical note is truncated and the tag only shows a Mil-Spec conforming part number. Crane issued one such valve in January 2017, issuing a CMTR certifying that the valve passed MIL-V-24625 testing. While the valve's tag was replaced, a photograph taken by Relator shows that the Mil-Spec tag does not contain any reference to a drilled disc. Crane has never been Mil-Spec certified for valves with a drilled disc as demonstrated here.

51.     Additional variants have been created throughout the years for Crane. In late 2016, Crane initially rejected a customer request to provide a drilled-disc valve with a ductile iron hand wheel. After the initial rejection, Crane then approved the change.   While Steve Ferguson indicated that the item would not be QPL-approved, the tag generated for the valve would indicate that it was, in fact, a Mil-Spec valve. Crane routinely ships valves with variations like these, making boilerplate objections to the production, but ultimately shipping the valves as though they are Mil-Spec certified.

### 8.     Significant Problems with Valve Shafts and Wedge Pins

52.     The shafts and wedge pins for Crane's Mil-Spec valves do not meet the MIL-V requirements; the hardening used results in more fragile shafts and wedge pins that pose a greater risk of failure. Under MIL-V-24624 the "stem" (shaft) and "Stem to disc fasteners" (wedge pins) for Type I and II valves are required to be constructed of certain types of material, including "ASTM A 564, type 630, hardening condition 1025 or 1075." MIL-V-24624(SH) Amendment 1, Table I. This is a specification that requires age-hardening of the material to specific hardening conditions. ASTM A 564 contains a table that provides the specifications for hardening conditions H1075 and H1025, which provides treatment temperatures, as well as the resulting tensile strength,

yield strength, elongation, hardness, and other characteristics. Crane's drawings for both Type I Mil-Spec valves approved by NAVSEA do not specify the hardening condition, instead only listing shafts and disc wedge pins constructed of material ASTM A564-630. Nevertheless, Crane is required to conform to the MIL-V-24624 specification for the shafts and wedge pins.

53.     Wedge pins are a vital safety feature of the valves. MIL-V-24624 requires the shaft to be "rigidly attached to the disc," which prevents the shaft from being expelled from the valve body in the event of component failure and injuring a sailor operating the valve. MIL-V-24624(SH) Amendment 1 3.7. This is accomplished by the wedge pins, which secure the disc to the shaft in conformance with the requirement.

54.     Despite the clear specifications provided in MIL-V-24624, **Crane does not and has never conformed to this specification for its shafts and wedge pins**. Instead, Crane supplies shafts conforming to hardening condition H1150. Crane's Bill of Materials shows hardening condition H1150. Materials certifications for Crane vendors for shafts show the same. However, per ASTM A 564, hardening condition H1150 is a lower standard heating condition that what is called for. Hardening condition H1150 heats components to a higher degree, which reduces tensile and yield strength, elongates the material and reduces the hardness when compared to hardening conditions H1025 and H1075. Ultimately this results in a more brittle product that carries a higher risk of failure.

55.     In addition to the hardness ratings, Crane's shafts and wedge pins for all Mil-Spec valves frequently do not match the approved specifications. For each different valve size, the drawings provide specific measurements for each wedge pin. The NAVSEA drawings provide four specific measurement dimensions: the full length of the pin ("A" on the drawings), the measurement of the "uncut" length ("B"), the diameter of the pin ("C"), and the angle. The

drawing also gives approved tolerances: A uses Standard Tolerance, B is ± .015, C is +.0002 and -.0003, while no variance is permitted in the angle.

56.     As discussed briefly above, Relator conducted a "gap analysis" to determine the variations in tolerances between the drawings submitted to and approved by NAVSEA and Crane's internal component drawings.   She identified which dimensions Crane determined to be critical to quality and compared each dimension to find where Crane allows for greater tolerance than was approved by NAVSEA. Crane allows greater variance than approved by NAVSEA for both the A dimension and the angle on every wedge pin length, as well as the C dimension on all but the smallest wedge pin. Thus, in **critical to quality** dimensions, Crane routinely allows larger variations than those approved by NAVSEA.

57.     In conducting this gap analysis, Relator also discovered Crane does not use the proper wedge pins for certain size valves. Relator determined Crane does not have internal wedge pin drawings that match the specifications for eight- or ten-inch valves. For the ten-inch valves, Crane uses the wedge pin approved for use in the 12- and 14-inch valves. For the eight-inch valves, Crane uses the wedge pin approve for use in six-inch valves. For both valve sizes, Crane is not using the proper wedge pins specified in the drawings approved by NAVSEA.

58.     In conducting the analysis, Relator also discovered an additional issue with the six-inch wedge pins. Drawing C0009F, the internal drawing for the wedge pin specified for the six-inch valve, states that the A dimension is 1.500. The NAVSEA-approved dimension for this wedge pin is 1.375. According to the drawing's revision log, this dimension was changed from 1.375" to 1.500" in 1994, per ECO 2686. Despite that change, the NAVSEA-approved drawing has not been updated. To Relator's knowledge, NAVSEA has never been notified of this component change.

59.     Additionally, at least one Crane drawing that is submitted to clients misidentifies

the components preventing "blowout." As previously discussed, MIL-V-24624 section 3.7 requires the valve shaft to be attached to the disc to prevent the shaft from "expulsion" from the valve in the event of part failure. This is referred to as a "blowout." Page 4 of Crane's drawing for its 5-inch wafer valve, component 05-1WA-5X3XGF-3XG, contains a "BLOWOUT PROOF DETAIL," depicting the upper portion of the shaft, the Cotter Keys, and the Snap Ring. None of the components prevent blowout as described and required in MIL-V-24624; this is the function of the wedge pin that affixes the shaft to the disc. While the parts continue to perform intended functions, this example further demonstrates the level of incompetence displayed by Crane in producing and certifying its Mil-Spec valves to clients as well as the institutional ignorance of the Mil-Spec requirements to which Crane is held.

**9.      Crane Sells Mil-Spec Valves n Sizes NAVSEA Never Approved**

60.     Crane frequently sells 2-inch valves for which it holds no certifications or NAVSEA approval. Of the four different types of Mil-Spec valves Crane sells, only the "NAVA Type 3" stainless steel wafer style valve is certified in the 2-inch size. The smallest valves that Crane is certified by NAVSEA to sell for the "NAVB Type 3," the "NAVA Type 1," and the "NAVB Type 1" is the 2.5-inch valve. Despite this restriction, Crane sells 2-inch valves of the types not approved for sale. In 2010, Crane sold multiple 2-inch versions of the NAVA Type 1 and NAVB Type 1 Mil-Spec valves in a single purchase order, issuing CMTRs for each type. This is not an isolated incident; Crane routinely sells 2-inch valves for all four of its Mil-Spec lines, despite being approved to only sell one type in the 2-inch variety.

**10.      Specialty Metals Restriction Requiring Purchase from American Sources**

61.     Title 10, United States Code, Section 4533b requires that items critical to national security and the components thereof to be made from specialty metals melted or produced in the

United States. The Secretary of Defense issued regulations as part of the Defense Federal Acquisition Regulation Supplements ("DFARS") prohibiting the Department of Defense or its prime contractors from purchasing "specialty metals"[4] not produced or melted in the United States.[5] 48 C.F.R. § 225.7003 *et seq*. The restriction applies to aircraft, missile and space systems, ships, tank or automotive items, weapon systems, and ammunition that contain any specialty metals. 48 C.F.R. § 225.7003-2. The restriction is subject to exceptions that exempt certain contracts from providing specialty metals melted or produced in the United States; some of the exceptions wholly exempt a contract from the restriction, while others exempt specific components of the military hardware listed above. *See* 48 C.F.R. § 225.7003-3. The regulations also require DOD contracting officers to approve exceptions at the time of the contract and include the restriction language, located at DFARS 252.225-7009, as a clause in the prime contract that should be flowed down to all subcontracts with any applicable exceptions. 48 C.F.R. § 225.7003-5(a)(2)(ii).

**11.    Additional Mil-Spec Valve Component Problems**

62.    In addition to the component issues detailed above, Crane routinely encounters additional problems with components in its Mil-Spec valves, none of which have ever been reported to NAVSEA as required by the DODM regulations. The following are examples of the issues discovered:

- Soft seat measurements fail critical to quality dimensions. Engineering gave a deviation on the part and Crane continues to ship valves with the soft seats. Additionally, Crane supplies a different style of soft seat in repair kits than the seat provided in the original valve. Like the original soft seat, the new seat does not match specifications;

---

[4] "Specialty metals" are defined as steel meeting certain alloy content restrictions, as well as titanium and titanium alloys, zirconium and zirconium alloys, and other metal alloys that meet certain alloy content requirements. *See* 48 C.F.R. § 252.225-7009(a).

[5]

- Mil-V Fireflow seats fail critical to quality dimensions. Relator had the MIL-V Fireflow seats cross-sectioned and measured at a third party lab at the Navy's request. Crane confirmed that it would measure the Mil-V Fireflow seats but is not equipped to do so. The lab returned results out of spec. Engineering generated a deviation and the seats continue to be placed in Mil-V valves;

- Numerous issues with Hex Head Capscrews exist. Each of Crane's NAVSEA-approved drawings specify that Hex Head Capscrews are to be 3/4-inch long. Crane frequently purchases Hex Head Capscrews that are 5/8-inch. Additionally, Huntington Ingalls Shipbuilding issued a quality alert regarding the screws, stating that cut screws would not be allowed. Huntington Ingalls discovered that many suppliers were trimming screws to length instead of purchasing proper screws. Crane is aware of this practice and regularly takes shipments with Certificates of Conformance identifying the Hex Head Capscrews as having been trimmed;

- The Mounting Bracket with Gear, used in Crane's Type III wafer and lug style valves, is not the material approved by NAVSEA. The NAVSEA approved drawings for NAVA 3 and NAVB 3 specify that the "Mounting Bracket w/Gear" be made of "Al. Brz. MIL-B-24480," meaning aluminum bronze that conforms to MIL-B-24480 specifications. Instead of the specified aluminum bronze, the metal used is ASTM B61, not MIL-B-24480 aluminum bronze;

- Hand Wheel sizes do not match what was approved by NAVSEA in each of the Mil-Spec drawings. For example, 10-inch hand wheels are only approved to be used on the 8-inch valve configuration. Crane frequently uses the 10-inch hand wheel in its 10-inch valve configuration. Additionally, 12-inch wheels are used in 17 different valve configurations in 10- and 12-inch sized valves, despite the NAVSEA drawings calling for an 18-inch hand wheel in those configurations;

- Crane has used Monel bolts in the assembly of its Mil-Spec valves for years prior to formal approval. In late 2015, NAVSEA notified Crane that it needed to resubmit drawings for each of its four Mil-spec valves. On the 2016 drawings for each type, Crane included and had approved Hex Head Capscrews of type "Monel QQ-N-281". This change was the central material change between the previously approved drawings and the current version which was approved March 1, 2016. Despite the issue coming to NAVSEA's attention in 2015 and approval in 2016, Crane used Monel bolts in its Mil-Spec valves for many years prior to the discovery by NAVSEA;

- Crane frequently sells Mil-Spec valves with limit switches attached despite never obtaining NAVSEA approval. Crane has sold Mil-Spec valves with limit switches attached since at least 2007, if not earlier. Issues with such valves arise frequently, as recently as April 2017. In one purchase order (PO NC85981-1) Crane shipped assembled Mil-Spec valves with limit switches attached but made a note that the valve is QPL approved but that the limit switch is not. Instead of shipping separate parts, however, Crane ships the valves and limit switches as a completed unit.

Crane does not and has never had NAVSEA approval to ship such valves under its QPLs.

- Washers are another item with which Crane has had multiple issues. The washers are used with a jam nut to attach the hand wheel to the gear. Crane frequently buys washers from unapproved vendors or from the wrong vendors to be used in Mil-Spec valves. Additionally, washer changes are made without performing any sort of First Article Inspections. For example, in November 2016, Crane issued an ECO regarding the Mil-Spec washers. The ECO acknowledges that the original specification requires 18-8 stainless steel, but Crane had been purchasing A479-316 stainless steel material. The ECO reverts the material for the part back to 18-8.

- Additionally, Crane's inventory system identifies a washer as having Part Number 13012-M005, designating the part as 18-8 stainless steel. In Crane's inventory, parts with the "M" prefix as used here designate products to be used in Mil-Spec designs. However, this part number is not assigned to any valves. Instead, Part Number 13012-0005, which is the subject of the above ECO, is used in Mil-Spec valves. Had Crane been using the correct part as identified in its system, the washers would have been constructed of approved material and not required the ECO.

**12. Additional Violations**

63. In addition to the above items, Relator has information and documentation related to other false claims act violations, listed generally below:

64. Crane routinely fails to conform to the requirements set forth in DFARS 252.225-7009, requiring that items or components be constructed from specialty metals made or produced in the United States or qualifying countries. Crane routinely provides components that are made from metals that are neither melted nor produced in the U.S. or a qualifying country. In addition, Crane receives components of its Mil-Spec valves that are made from noncompliant metals. Relator is aware of one supplier that places "Made in Canada" stickers on the component before sending the valves to Crane, despite obtaining the component in China. Furthermore, Crane discusses applicable exceptions to the DFARS requirement while not procuring additional guidance from NAVSEA or the prime contractor.

65.     Crane holds ISO-9001 certification for its quality management system. Crane routinely uses the certification as a shield, despite numerous failures of the system and lack of process and quality controls. While Crane conducts audits (both internal and external) on a regular basis, Crane routinely ignores the audit findings and falsely states and/or fails to implement corrective actions. Instead of seeking to meet the ISO-9001 requirements, Crane adopts a culture of obfuscation and deception, struggling to give the appearance of conformity while consistently circumventing the requirements.

66.     Crane routinely fails to perform First Article Inspections on new components. In some instances, components failed First Article Inspections but Crane affirmed them as passed to Crane's client. In 2016, Crane replaced one of its vendors for a number of components used in Mil-Spec valves. Notwithstanding the trigger, Crane failed to perform First Article Inspections on each of the products.

67.     W&O notified Crane about shock and vibration test failures with one of Crane's 2.5-inch Mil-Spec lug valves. Relator conducted an investigation and determined that Crane provided valves that had downsized necks, which resulted in cracking of the neck. Despite Crane's awareness of what happened, Crane approved the distribution of the valve with the downsized neck, despite efforts to revise the design to strengthen the neck. Crane failed to report the issues to NAVSEA.

68.     Crane routinely fails to use its approved vendors and purchases components and parts from unapproved vendors. Additionally, it circumvents purchase order and bill of materials tracking by using "expense purchase orders," which are used for the purchase of office expense-type items (e.g. pens, paper, chairs, etc.). Additionally, Crane employees will purchase components with Crane expense cards to circumvent the purchase order process.

**D.**     **Crane's False Representations and Certifications About QPL**

69.     Crane has made and continues to make false representations to the Government and Prime Contractors to the Government that it complied with the Qualified Products List, Military Specification Mil-V-24624, and other contractual requirements.

70.     Subsequent to the execution of the Government's Agreement with Crane on or about February 2007, Crane knew QPL regulations required that it could only manufacture valves in accordance with MIL-V-24624 specifications.   Crane had direct and specific knowledge of this requirement by virtue of, and demonstrated by, numerous correspondences with the Government as well as the the 2007 Agreement.

71.     At all times relevant herein, Crane's acts in violation of 31 U.S.C. § 3729, *et seq.,* were performed knowingly by officers and/or employees of Crane who were acting within the scope of their employment and for the benefit of their employer.

72.     Crane's actions have deprived the United States of the pre-contractual assurance of conformity that the QPL program is intended to provide. Crane's actions and inactions have undermined the integrity of the QPL program itself as a whole.

73.     The United States has a compelling interest in developing and fostering a robust pool of manufacturers capable of providing the items for which QPL listings have been established and that are necessary to maintaining the national military infrastructure, such as suppliers of butterfly valves made in accordance with military specification Mil-V-24624. Crane's actions have undermined the United States of the ability to do just that. Potential competitors who legitimately adhere to the requirements of military specifications and the QPL will be less well positioned to have the advantageous pricing structure of those who do not comply. Ultimately, elimination of a robust base of viable

suppliers can lead to the United States being at the mercy of a pricing structure dictated by the last remaining manufacturer of a necessary QPL item.

74.     In reliance on the above-described representations and the false certifications submitted by Crane to the United States and to prime contractors, the Government paid Crane or paid the prime contractors seeking reimbursement for payments to Crane with appropriated funds from the United States' Treasury.

**E.     Crane's Failure to Report Quality Discrepancy Issues to the Qualifying Activity**

75.     The obligations of a manufacturer of a QPL item extend beyond the mandatory approvals of, and notifications of change in, a QPL item manufacturing plant. Those obligations include, among other things, the responsibility to "[e]nsure that delivered items conform to all requirements including performance, quality, reliability, and all other specified product characteristics." (Enclosure 14, ¶ AP2.7.1.3) and to "[r]eport immediately any discrepancies disclosed during testing, periodic reexamination of its products and production processes and controls to the Qualifying Activity." (Enclosure 14, ¶ AP2.7.1.2).

76.     Crane did not report any of the aforementioned non-conforming discrepancies to the Qualifying Activity and Crane's failure to do so was a violation its obligations under the QPL program requirements.

77.     Certain of the aforementioned non-conformances reflect a failure of a quality system as is required by military specification Mil-V-24624 ¶ 4.1.1, the QPL regulations, and prime contractor requirements. Adequately performed quality measures would have identified many of the above discrepancies noted.

78.     Throughout the period of Crane's correspondence and discussions with the Qualifying Activity, Crane failed to disclose to the Qualifying Activity the aforementioned quality

issues or discrepancies.

## CAUSES OF ACTION

**A.      Count 1 - False Claims Act Violations, 31 U.S.C. § 3729(a)(1)**

79.      The United States incorporates the allegations of paragraphs 1 through 78 as if fully set forth herein.

80.      As set forth above, Crane knowingly failed to meet contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements as required under the Government and prime contractor contracts.

81.      Crane knowingly presented, or caused to be presented, to officers or employees of the United States Government false claims for payment or approval by falsely representing compliance with contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements as required under the Government and prime contractor contracts in violation of 31 U.S.C. § 3729(a)(1).

82.      As a result of the Crane's submission of false claims, the Government suffered actual damages in an amount to be proven at trial.

**B.      Count II - False Claims Act Violations, 31 U.S.C. § 3729(a)(2)**

83.      The United States incorporates the allegations of paragraphs 1 through 78 as if fully set forth herein.

84.      As set forth above, Crane knowingly failed to meet contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements under the various

contracts it entered into with prime contractors to the United States.

85.     As set forth above, Crane knowingly made, used, or caused to be made or used, false records or statements regarding its compliance with contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements in order to obtain payment or approval by the Government of false claims, in violation of 31 U.S.C. § 3729(a)(2).

86.     As a result of the Crane's submission of false statements to get a claim paid by the United States, the Government suffered actual damages in an amount to be proven at trial.

**C.     Count III - Payment by Mistake**

87.     Plaintiff incorporates by reference herein the allegations made above in. paragraphs 1 through 78, inclusive.

88.     Crane caused the United States to make payment in the mistaken belief that all contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements had been met when, in fact, they had not been met. In such a circumstance, payment was by mistake and was not authorized.

89.     As a result of that unauthorized payment, the United States has sustained damages in an amount to be proven at trial.

**D.     Count IV - Unjust Enrichment**

90.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 78, inclusive.

91.     Crane has been unjustly enriched by Crane's failure to meet contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in

accordance with military specification Mil-V-24624 and QPL requirements by Crane's submission of false and fraudulent claims, and by Crane's receipt of payments to which it was not entitled contractually or otherwise.

92.     In equity and good conscience, Crane should not retain those payments, and they should be returned to the United States.

**E.     Count V - Breach of Contract**

93.     Plaintiff incorporates by reference herein the allegations made above in paragraphs 1 through 78, inclusive.

94.     By virtue of the acts set forth above, Crane breached contracts with the United States by its failure to meet contract requirements and specifications concerning manufacture and delivery of butterfly valves manufactured in accordance with military specification Mil-V-24624 and QPL requirements.

95.     Crane's breaches of contracts with the United States are material.

96.     The United States has suffered damages, including consequential damages, in an amount to be proven at trial as a result of Crane's breach of contract.

## <u>PRAYER</u>

WHEREFORE, the United States prays for judgment against Crane, as follows:

97.     Under Counts I - II, a sum equal to three times the amount of the damages the United States has sustained, plus such civil penalties as are allowable by law; or

98.     In the alternative, under Count III, a sum equal to the amount which the United States paid by mistake, plus interest and costs; or

99.     In the alternative, under Count IV, a sum equal to the amount by which Crane was unjustly enriched, plus interest and costs; or

100.    In the alternative, under Count V, a sum equal to the damages suffered by the

United States, including consequential damages, plus interest and costs; and,

101.    Such other relief as this Court may deem just and proper, together with interest and

costs of this action.

GAUNTT, KOEN, BINNEY & KIDD, LLP


By: _/s/ Geoffrey S. Binney_____
   Geoffrey S. Binney
   Fed. Bar No 32660
   State Bar No. 24029071
1400 Woodloch Forest Dr., Suite 575
The Woodlands, Texas   77380
Telephone: 281/367-6555
Facsimile: 281/367-3705
Attorneys for Qui Tam Plaintiff
Corla Jacobson